UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARY MICHAEL HORVATH,

              Plaintiff,                       Civil Action No. 12-CV-10991

      v.                           District Judge Mark A. Goldsmith
                                   Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

              Defendant.
_____/

**REPORT AND RECOMMENDATION TO
GRANT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [10] AND
DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [16]**

Plaintiff Cary Michael Horvath appeals Defendant Commissioner of Social Security's ("Commissioner") denial of his applications for period of disability, disability insurance benefits, and supplemental security income. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 2) are the parties' cross-motions for summary judgment (Dkts. 10, 16). For the reasons set forth below, this Court finds that the Administrative Law Judge's reasons for giving less than controlling weight or great deference to a treating physician are not supported by substantial evidence. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 10) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 16) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## I. BACKGROUND

Horvath was 50 years old on the date he alleges he became disabled.  (*See* Tr. 148.)  He has one year of college education.  (Tr. 77, 261.)  He has worked as a carwash attendant, parking lot attendant, and delivery driver.  (Tr. 79-80, 238.)

In his application, Horvath alleged disability on the basis of "severe depression, bad back, problem with both legs, mainly on the left."  (Tr. 172.)  He alleged that he stopped working because "I really could not be around anybody," and that his ability to work is limited "because of my depression and paranoi[a].  I really don't even go out of the house.  I am just very depressed."  (*Id.*)

### A.  Procedural History

On January 10, 2008, Plaintiff applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") asserting that he became unable to work on October 25, 2007.  (Tr. 97, 99, 148.)  The Commissioner initially denied Plaintiff's disability application on June 13, 2008.  (Tr. 97, 99.)  Plaintiff then requested an administrative hearing and on January 26, 2010, he appeared with counsel before Administrative Law Judge ("ALJ") Roy L. Roulhac who considered his case *de novo*.  (Tr. 73.)  In an April 29, 2010 decision, the ALJ found that Plaintiff was not disabled.  (*See* Tr. 67.)  The ALJ's decision became the final decision of the Commissioner on January 18, 2012, when the Social Security Administration's Appeals Council denied Plaintiff's request for review.  (Tr. 1.)[1]  Plaintiff filed this suit on March 6, 2012.  (Dkt. 1, Compl.)

--------

[1]Plaintiff submitted new evidence to the Appeals Council after the ALJ issued his opinion.  Because this evidence–Exhibits 13E, 12F, 13F, 14F, and 15F–was not part of the administrative record before the ALJ, the Court does not consider it for purposes of this appeal.  *See Davenport v. Comm'r of Soc. Sec.*, No. 10-13842, 2012 WL 414821, at *1 n.1 (Jan. 19, 2012) ("In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision . . . those 'AC' exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review.") (citing *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993) and *Cline*

### B. Medical Evidence

Although Horvath asserts that he became disabled on October 25, 2007, the earliest medical evidence in the record is from January 2008. On January 15, 2008, Horvath underwent a psychiatric evaluation by M. N. Siddique, M.D., a Child Psychiatrist at Arab Community Center for Economic and Social Services ("ACCESS"). (Tr. 260-62.) Horvath had sought help at ACCESS for severe depression, anxiety, poor sleep and appetite, weight loss, crying spells, stress from lack of a job and separation from his wife, occasional voices, and paranoia. Dr. Siddique diagnosed major depression with psychotic features and rule-out diagnoses of general anxiety disorder and bipolar disorder depression. (Tr. 262.) He assessed Horvath's Global Assessment of Functioning ("GAF") at 47. (*Id.*)[2] On mental-status examination, Dr. Siddique found that Horvath's memory and concentration were adequate. (Tr. 261.) But he concluded that Horvath's "[j]udgment presently is impaired due to his underlying depression." (Tr. 262.) Dr. Siddique recommended "[i]ndividual therapy, assertive training, and anger management," "[c]ase management services to help him with getting medical insurance and helping him with employment opportunities," and "family therapy with [his] wife if she is willing." (*Id.*) He prescribed Pexeva for depression and anxiety and Seroquel "to help

---

*v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir.1996)), *report and recommendation adopted by* 2012 WL 401015 (E.D. Mich. Feb. 8, 2012).

[2] A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV")*, 30–34 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32. A GAF score of 41 to 50 reflects "[s]erious symptoms (e.g. suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *DSM–IV* at 34.

to reduce anxiety, help with sleep, and control psychotic symptoms." (*Id.*)

Dr. Siddique continued to treat Horvath approximately every other month. (*See* Tr. 292.) The record before the ALJ included Dr. Siddique's handwritten notes from 12 examinations: January, February, April, June, August, October, and November 2008, and January, March, May, July, and September 2009. (Tr. 301-14.) In February 2008, Dr. Siddique prescribed Xanax, Abilify, and Lexapro and discontinued the prescription for Pexeva. (Tr. 304.) He increased the dosages in April 2008 (Tr. 305), and then kept the prescriptions unchanged until May 2009, when he discontinued the Lexapro and started Cymbalta. (Tr. 312.) Horvath also saw a therapist twice a month at ACCESS (Tr. 87), but there were no notes or opinions from a therapist in the record before the ALJ.

Dr. Siddique's notes are difficult to read but partially legible. They record some improvement in Horvath's mental health although in general his symptoms persist. In February 2008, Dr. Siddique wrote that Horvath was "[f]eeling slightly better but still anxious," and "[l]ess depressed," but "[a]ppetite unimproved." (Tr. 304.) In April, he noted "[i]ncreased mood swings and not as responsive to present meds," "[d]epression and anxiety reduced but still present." (Tr. 305.) In June, Dr. Siddique reported that Horvath "stated he is doing better with increased mood–less anxious and moody. Residual depression still present." (Tr. 306.) In August: "Depression and anxiety still present. Less moody." (Tr. 307.) October: "Better self control and reduced anxiety. Mild depression still evident. Appetite picky. Sleep adequate. [illegible] Still moody and anxious." (Tr. 308.) November: "Has not had therapy since previous therapist left and wants [illegible] therapy as it was helping him." (Tr. 309.) In January 2009, Dr. Siddique reported that Horvath "[h]as gotten a new therapist and stated he has to get used to her. . . . States meds do

4

help him–reduced depression and anxiety and less agitated and irritable [illegible]." (Tr. 310.) In March: "Underlying pain from spinal problem worsens his depression and anxiety. Appetite 'picky.' Sleep is ok. [illegible] Mild irritability." (Tr. 311.) In May: "Complained of lot of joint pain in addition to depression and anxiety." (Tr. 312.) After Dr. Siddique changed Horvath's prescriptions, he reported in July: "Pt does not see much improvement. Stated that Cymbalta is [illegible] but partially. Reduced anxiety with increased Xanax. Sleeping slightly improved." (Tr. 313.) In September, Dr. Siddique wrote: "Difficulty walking or even standing. It worsens his depression, anxiety, and irritability." (Tr. 314.)

In January 2010, Horvath's counsel transmitted to DDS a "psychiatric/psychological impairment questionnaire" that Dr. Siddique completed regarding Horvath. (Tr. 291-99.) In the questionnaire, Dr. Siddique provided diagnoses of major depression with psychotic features and generalized anxiety disorder. (Tr. 292.) He assessed Horvath's current GAF at 46 and noted that Horvath's lowest GAF in the past year was 47. (*Id.*) Dr. Siddique identified clinical findings in support of his diagnoses, including appetite, sleep, and mood disturbance, delusions or hallucinations, paranoia or inappropriate suspiciousness, perceptual disturbances, and social withdrawal or isolation, but he also noted "[n]o overt paranoia and not hearing voices." (Tr. 293-94.) He commented, "Has always worked or self employed until recently. Feels frustrated and helpless at his present situation." (*Id.*)

Dr. Siddique indicated that Horvath was markedly limited in his ability to understand and remember detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; to work in coordination with or proximity to others without being distracted by them; to

5

complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently. (Tr. 295-97.)  He endorsed additional mental functional limitations as moderate or mild.  (*See id.*)

Dr. Siddique agreed that Horvath's impairments were ongoing and expected to last at least 12 months.  (Tr. 298.)  He did not think Horvath was malingering.  (*Id.*)  He opined that Horvath's psychiatric condition exacerbates his physical symptoms, explaining that Horvath has "responded partially to Cymbalta," which "does help with depression with somatic complaints like pain."  (*Id.*)  Dr. Siddique further opined that Horvath is likely to have more bad days than good days, and would likely be absent from work more than three times a month.  (Tr. 298-99.)

On April 8, 2008, Horvath was examined by Ibrahim Youssef, M.D., a psychiatrist, at the request of the state Disability Determination Service ("DDS").  (Tr. 268.)  Horvath told Dr. Youssef that the Abilify, Xanax, and Paxil prescribed by his psychiatrist at ACCESS had helped 25 percent, as he felt more relaxed.  (Tr. 269.)  Dr. Youssef diagnosed major depression, single episode, severe, with psychotic symptoms.  (Tr. 270.)  He assessed Horvath's GAF at 40.  (*Id.*)[3]  Dr. Youssef observed, "[f]rom my conversation the patient's deterioration of functioning is due to his increased depressive signs and symptoms."  (Tr. 269.)

On May 16, 2008, DDS consulting psychologist Kathy Morrow completed the Social

---

[3] A GAF score of 31 to 40 reflects "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  *DSM–IV* at 34.

Security Agency's Psychiatric Review Technique form, apparently based solely on a review of Horvath's case file.  (Tr. 277-90)  She identified a moderate degree of limitation in all three functional areas of the "B" criteria that the Commissioner uses to evaluate the severity of a mental impairment, s*ee* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 *et seq.,* and found no episodes of decompensation.  (Tr. 287)  Morrow also completed a Mental Residual Functional Capacity Assessment.  (Tr. 273-76)  She indicated that Horvath is moderately limited in his ability to understand, remember, and carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and ability to set realistic goals or make plans independently of others. (Tr. 273-74.) She concluded:  "Hence, the clmt retains the mental capacity to sustain an independent routine of simple work activity.  He can tolerate low stress social demands and adapt to simple changes in routine.  He may be limited in meeting more complex and detailed work demands."  (Tr. 275.)

Horvath's medical records reflect that he reported to his doctors that his back and leg pain began around 2004 or 2005 following an injury while lifting (Tr. 338, 340) and also that in about 2005 he was informed by a doctor that he had arthritis in his back (Tr. 329; *see also* Tr. 83).  But the earliest evidence of treatment for pain in the record is not until 2008, after Horvath filed for disability.  On April 9, 2008, Horvath was seen by Dr. Joel M. Shaveli, a rheumatologist, for his low-back pain.  (Tr. 329)  He also complained of numbness in his ankles and pain in his knees, but had no morning stiffness, redness, or swelling.  (*Id.*)  Dr. Shaveli commented, "At this point that is

all I [can] say other than he complains of pain, but there is nothing significant about the pain and nothing substantiated as far as history goes.  What he is saying is he is going for disability at this point and he has not been working." (*Id*.)  On physical examination, Dr. Shaveli noted: "He was ab1e to flex and extend his back without any problems," "able to walk on his heels and toes without any difficulty," "no loss of balance," "able to straight leg raise without pain and get off the table from a completely supine position to 90 degrees," and "he was laying on his back with his knees bent over which you could not do if you had a severe back issue." (*Id.*)  Dr. Shaveli did note that Horvath smoked a pack and a half of cigarettes a day, and had a "prolonged expiratory phase" on lung examination.  (*Id*)  Dr. Shaveli diagnosed chronic obstructive lung disease, emphysematous type, and recommended a chest x-ray.  (*Id*)  The chest x-ray, taken on April 9, 2008, revealed no abnormalities.  (Tr. 327.)

On May 23, 2008, Horvath saw Dr. J. U. DeSousa, a neurologist, at Midwest Health System for the first time, complaining of back pain radiating to his legs that had been ongoing for two years following an injury while lifting.  (Tr. 340.)  During examination Dr. DeSousa noted that Horvath had difficulty walking, especially with his right leg.  (*Id*.)  Dr. DeSousa's impression was "[r]ule out the possibility of lumbar radiculopathy.  The radiation into the right leg could be due to herniated lumbar disk, otherwise no other definite neurological findings." (*Id*.)  Dr. DeSousa advised Horvath to have a CT scan and EMG.  (*Id*.)  Dr. DeSousa saw Horvath again on June 27, 2008, for a follow-up regarding back pain.  (*Id*.)  The examination notes are handwritten and illegible.  (Tr. 339.)

On August 20, 2008, Horvath was seen by a physician assistant ("PA") at Midwest Health, complaining of lower back pain with muscle spasms.  (Tr. 338.)  The PA noted that Horvath "wants to [change] from Dr. DeSousa." (*Id*.)  Her examination showed some abnormalities including

8

increased temperature in the left lower extremity and decreased pinprick sensation at left L5.  (*Id.*)

She repeated Dr. DeSousa's rule-out diagnosis of lumbar radiculopathy and his recommendation to

obtain a CT scan  of the lumbar spine.  (*Id.*)  She also wrote, "[r]efer to Dr. [illegible]–insistent on

getting soma and Darvocet."  (*Id.*)

Horvath underwent a CT scan of his lower spine on September 9, 2008.  (Tr. 317.)  The

impression was "[m]ultilevel spondylotic changes most significant in the caudal lumbosacral spine,"

including "[h]ypertrophic degenerative facet changes" and "broad-based disc bulges with

ligamentum flavum hypertrophy at these levels contributing to mild central canal stenosis at L3-L4,

mild to moderate at L4-L5 and mild at L5-S1," but "[n]o significant neuroforaminal encroachment."

(*Id.*)

Horvath saw a Dr. Marcus at Midwest Health on December 18, 2008, again complaining of

back and right leg pain.  (Tr. 337.)  The notes from this examination are handwritten and largely

illegible, but they do note that sitting, Soma, and Tylenol 4 reduced Horvath's pain.  (*Id.*)  On May

23, 2009, Horvath was examined again for back pain, as well as right knee pain, this time by a Dr.

Degugman.  (Tr. 336.)  These notes are also illegible, but it does appear that Dr. Degugman gave

Horvath a new prescription, for Vicodin.  (Tr. 336.)

### C.  Testimony at the Hearing Before the ALJ

#### 1.  *Plaintiff's Testimony*

At the administrative hearing before Judge Roulhac on January 26, 2010, Horvath testified

that he stopped working because he "just can't be around too many people," and he had "started

barricading [him]self more or less in, in, in the house."  (Tr. 80.)  When he is around other people,

he explained, "I get very paranoid and I just feel people are watching me.  And, and I go home, like

9

from here I'll lock myself up in, you know, lock myself in the, you know, house." (Tr. 81.)  When asked whether he feels he has improved since he started going to therapy at ACCESS, Horvath said: "I still have like all my, I still have my paranoia and things we're working on her and I, you know. I was going, I was seeing her once a month and she decided to change it to twice a month to see her." (Tr. 87-88.)

Horvath also testified that he cannot work because the medications he takes cause him to sleep most of the day, because he needs a knee replacement, and because of arthritis in his lower spine. (Tr. 81-83.)

### 2. The Vocational Expert's Testimony

At the hearing, the ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for someone with functional limitations approximating Horvath's. The ALJ asked about job availability for a hypothetical individual of Plaintiff's age, education, and work experience who was capable of "light work lifting not more than 20 pounds occasionally and 10 pounds frequently," "[w]ho could stand for four hours and sit for four hours in an eight hour workday with a sit/stand option at will," "occasionally to climb ramps and steps, to balance, stoop, kneel, crouch, and crawl," "should avoid unprotected heights," and "be limited to performing unskilled work, that is simple tasks." (Tr. 92.)  The VE testified that such an individual could not perform Horvath's past relevant work, but that other jobs would be available to him: about 1,500 assembly jobs (Dictionary of Occupational Titles ("DOT") 706.687-010), about 1,500 machine-tending jobs (DOT 754.685-014), about 1,000 sorting or inspecting jobs (DOT 727.687-062), and about 1,000 counter-clerk jobs (DOT 249.366-010). (Tr. 93.)

The ALJ asked the VE how the availability of jobs would be affected if the hypothetical

individual could have only occasional interaction with coworkers or the public.  (*Id.*)  The VE testified: "certainly the rental clerk or counter clerk job would involve public contact so that would rule out those jobs.  But the assembly, inspecting, checking, machine tending, the interactions with co-workers would generally be superficial and, you know, it's not like they're working as part of a team necessarily so those would still remain."  (*Id.*)

The ALJ then posed a third hypothetical, asking the VE about the availability of jobs for a hypothetical individual of Plaintiff's age, education, and work experience who was capable of work at the sedentary level, with all of the other limitations from the first two hypotheticals. (Tr. 94.)  The VE testified: "At the sedentary, unskilled range of work with a sit/stand option and the occasional contact with public and co-workers there would be inspecting and checking jobs," "simple assembly," "packaging jobs," and "simple machine tending."  (*Id.*)  She identified DOT codes 521.687-086, 734.687-018, 715.684-026, and 690.865-194, with about 1,000 available jobs in southeast Michigan for each.  (*Id.*)[4]  The VE noted that the DOT does not include a sit/stand option, so she based her numbers on her experience in job placement in southeast Michigan.  (*Id.*)

In response to questioning by Horvath's counsel, the VE testified that a hypothetical individual who had three absences from work per month would "rule out all of these jobs and any other jobs."  (Tr. 94.)  When Horvath's counsel asked about "unscheduled breaks due to limits in concentration or crying spells," the VE testified that "generally, these types of jobs allow for a couple of breaks, usually a 15 minute break twice during an 8 hour shift, 30 minute lunch break. So if a person is off task and not able to produce it would be, it wouldn't be tolerated unscheduled

---

[4]DOT code 690.865-194 does not exist.  The VE may have meant 690.685-194, grinding-machine operator, which is sedentary level.

11

off task." (Tr. 94-95.)   She testified that all of the jobs she identified would require a certain

production pace, and "inability to sustain that pace would affect those positions."  (Tr. 95.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act (the "Act"), disability insurance benefits (for qualifying wage

earners who become disabled prior to expiration of their insured status) and supplemental security

income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727,

730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the:

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to
> last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Social Security regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are
denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments
that "significantly limits . . . physical or mental ability to do basic work activities," benefits
are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe
impairment that is expected to last for at least twelve months, and the severe impairment
meets or equals one of the impairments listed in the regulations, the claimant is conclusively
presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied
without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other
work exists in the national economy that plaintiff can perform, in view of his or her age,
education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Roulhac found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of October 25, 2007. (Tr. 60.) At step two, he found that Plaintiff had the following severe impairments: back disorder, right knee pain, chronic obstructive pulmonary disorder, and depressive disorder. (Tr. 61.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 61-62.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform

> light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can stand/walk for a total of 4 hours in an 8-hour day, sit for a total of 4 hours in an 8-hour workday, and requires a sit/stand option at will. The claimant can climb ramps/steps, balance, stoop, kneel, crouch, and crawl on an occasional basis. The claimant can perform work that does [not] involve unprotected heights. The claimant is able to do unskilled work performing simple tasks. The claimant can perform work that does not involve more than occasional contact with co-workers and the general public.

(Tr. 62-66.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 66.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 66-67.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act. (Tr. 67.)

### III.  STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole.  *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council."  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir.

14

2001).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006).  Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility."  *Bass*, 499 F.3d at 509;  *Rogers*, 486 F.3d at 247.

## IV.  ANALYSIS

Plaintiff first argues that the ALJ erred in weighing the medical opinions of his treating psychiatrist, Dr. Siddique.  (Pl.'s Mot. Summ. J. at 7-11.)  Dr. Siddique's January 2010 opinion, if adopted by the ALJ, could have resulted in a finding of disability because it stated that Horvath "would likely be absent from work more than three times a month" (Tr. 298-99), which the VE testified would preclude Horvath from working at any available job (Tr. 94).  In addition, Dr. Siddique opined that Horvath was markedly limited in his "ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  (Tr. 296.)  This also weighs in favor of a finding of disability in light of the VE's testimony that for the available jobs she identified, "if a person is off task and not able to produce it would be, it wouldn't be tolerated," and that all the jobs she identified would require a certain production pace, and "inability to sustain that pace would affect those positions."  (Tr. 94-95.)  The ALJ assigned Dr. Siddique's opinion "little weight."  (Tr. 65-66.)

Under the treating source rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting former

20 C.F.R. § 404.1527(d)(2) now § 404.1527(c)(2)); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). Even if the ALJ finds that a treating physician's opinion is not entitled to "controlling weight," there is a rebuttable presumption that the opinion of a treating physician is entitled to "great deference." *Rogers*, 486 F.3d at 242; *see also* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4. To rebut the presumption, the ALJ must show that substantial evidence supports not deferring to the treating source. *See Rogers*, 486 F.3d at 246. This includes demonstrating that he considered the non-exhaustive list of factors in 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c). *See Rogers*, 486 F.3d at 242 ("When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors."); *see also Wilson*, 378 F.3d at 544; Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4.

As a procedural matter, the ALJ must expressly provide "good reasons" for the weight assigned to a treating-source opinion. *See Gayheart*, 710 F.3d at 376; *Rogers*, 486 F.3d at 243; *Wilson*, 378 F.3d at 544. The Court emphasizes that this right is substantial: abridgement warrants remand even when substantial evidence supports the ALJ's ultimate disability determination. *Rogers*, 486 F.3d at 243. Stating that a treating-source opinion is "not supported by treating records," or is in "conflict[] with the record as a whole and is not fully supported by the objective evidence" while citing every medical exhibit in the administrative record save one, does not suffice to comply with the reasons-giving requirement. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as

16

'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." (citation omitted)).

Before turning to the substance of the ALJ's opinion regarding Dr. Siddique, the Court will address Plaintiff's argument that "other than his initial typed psychiatric assessment, most of Dr. Siddique's treatment notes are entirely illegible," and "[m]any Courts have found that illegibility of important evidentiary material requires remand for clarification and supplementation of the record from that medical source."  (Pl.'s Mot. Summ. J. at 8.)  According to the persuasive authority Plaintiff cites, where the "court has no way to determine whether the Secretary fully understood some of the medical reports before him" and "the medical records are crucial to the plaintiff's claim, illegibility of important evidentiary material has been held to warrant a remand for clarification and supplementation." *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975); *see also Miller v. Heckler*, 756 F.2d 679, 680-681 (8th Cir. 1985) (finding that the Commissioner failed to develop evidence from claimant's treating sources as to her mental and physical impairments and remanding where "the record contains nothing more than handwritten entries, which are in large part illegible").

Courts in this district have previously followed these authorities.  *See Toussaint v. Comm'r of Soc. Sec.*, No. 10-14827,  2012 WL 592198,  at *8-9 (E.D. Mich. Feb. 1, 2012) (recommending remand for supplementation and clarification where the ALJ found there was no evidence in the treating source's notes to support plaintiff's claim but "none of his treatment notes are legible, except for those few instances where reports were typed when plaintiff was admitted to the hospital"), *report and recommendation adopted*, 2012 WL 592056 (E.D. Mich. Feb. 23, 2012); *Belton v. Comm'r of Soc. Sec.*, No. 10-14558, 2011 WL 6000765, at *8-9 (E.D. Mich. Nov. 4, 2011)

17

(recommending remand for supplementation and clarification where "the ALJ stated that he rejected [the treating source's] findings after reviewing the physician's treating notes . . . .  However, more than half the pages of Exhibit 17F are blacked out and thus unreadable"), *report and recommendation adopted*, 2011 WL 6000754 (E.D. Mich. Nov. 28, 2011).

In this case, however, the Court disagrees that the notes are "entirely illegible," as Plaintiff contends.  Remand for clarification or supplementation of Dr. Siddique's treatment notes is not required.  Dr. Siddique's handwritten treatment notes are not so illegible that this Court cannot determine whether substantial evidence supports the ALJ's findings regarding them.

Turning now to the ALJ's assessment of Dr. Siddique, Plaintiff argues that ALJ Roulhac erred in assigning "little weight" to his treating psychiatrist's opinion.  ALJ Roulhac reasoned that Dr. Siddique's opinion was "not supported by a longitudinal treatment record between February 2008 and September 2009." (Tr. 66.)  Plaintiff emphasizes that the ALJ's analysis of Dr. Siddique's opinion was limited to this "single sentence," and argues that "[i]t is unclear from the ALJ's blanket rejection what findings in the treatment notes from Dr. Siddique he believed were inconsistent with the treating psychiatrist's opinions on Mr. Horvath's mental functioning."  (Pl.'s Mot. Summ. J. at 8.)

The Commissioner responds that "Plaintiff fails to appreciate the ALJ's analysis of the records of the treating psychiatrist, Dr. Siddique." (Def.'s Mot. Summ. J. at 3.)  The Commissioner points out that the ALJ described Dr. Siddique's treatment records and observed that "while Plaintiff complained of a wide range of symptoms such as crying spells and auditory hallucinations, he did not continue to report these symptoms at follow-up," but "[r]ather, he reported feeling better and less depressed, even though he was under stress at times." (Def.'s Mot. Summ. J. at 3, *citing* Tr. 65.)

18

Thus, the Commissioner argues, "Dr. Siddique's opinion was 'not supported by a longitudinal treatment record between February 2008 and September 2009' because it fails to reflect the improvement that is apparent in Dr. Siddique's own notes." (Def.'s Mot. Summ. J. at 3, *citing* Tr. 66.)[5]

The Commissioner is correct that the ALJ did discuss Dr. Siddique's treatment notes at some length. (*See* Tr. 65.) This discussion may properly be considered as part of the ALJ's reasoning for assigning "little weight" to Dr. Siddique's January 2010 opinion. *See Friend*, 375 F. App'x at 551 ("[T]he procedural protections at the heart of the [treating-source] rule may be met when the 'supportability' of a doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments. . . .  If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused."). Considering the ALJ's discussion of Dr. Siddique's treatment notes as part of his reasoning for rejecting the January 2010 opinion is especially appropriate here because the ALJ expressly referenced the "longitudinal treatment record" when he

---

[5] The ALJ's statement that Dr. Siddique's opinion "is given little weight because it is not supported by *a longitudinal* treatment record" (Tr. 65-66, emphasis added), read literally, could mean that the ALJ found that Dr. Siddique was not entitled to treating-source deference because he did not have an ongoing treatment relationship with Horvath. *See* 20 C.F.R. § 404.1502 ("Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."). In that case, the ALJ's assessment would not be supported by substantial evidence; at the time of the opinion, Dr. Siddique had been Horvath's treating psychiatrist for approximately two years, had met with him approximately every other month, and had prescribed and adjusted several medications. (Tr. 292, 301-314.) *Cf. Kornecky*, 167 F. App'x at 506-507 (discussing the longitudinal relationship requirement for treating source deference and finding that "given the nature and prolonged course of [claimant's] mental difficulties, a single examination did not suffice").

assigned little weight to Dr. Siddique's opinion.  (*See* Tr. 66.)

If Dr. Siddique's treatment records reflected a trend of improvement that was inconsistent with the level of functional limitations he identified in his opinion, the opinion would not be due controlling weight, *see Wilson*, 378 F.3d at 544, and possibly would not be entitled to "great deference," *see Rogers*, 486 F.3d at 242; 20 C.F.R. § 404.1527(c)(3) and (4); 20 C.F.R. § 416.927(c)(3) and (4).  But the ALJ's description of a trend of improvement is not supported by substantial evidence.  The ALJ wrote:

> During none of his visit[s] did he complain about weight loss, crying spells, decreased focus and memory, being socially withdrawn or that he had paranoid thinking or auditory hallucinations, which formed the basis of his low GAF scores during his psychological evaluation [] in January and April 2008.  Rather, beginning in February 2008, he began reporting that he was feeling better, less depressed, but still anxious.  Over time, he reported that his medications were working and although he was under stress at times, such as when his application for social security benefits was denied, he was less depressed and less agitated and irritable (Exhibit 8F).

(Tr. 65.)  Dr. Siddique's notes of improvement after February 2008 are more equivocal than the ALJ suggests.  For example, in June 2008 Dr. Siddique noted "increased mood–less anxious and moody" but also "[r]esidual depression still present," (Tr. 306), and in August 2008 "[l]ess moody" but "[d]epression and anxiety still present" (Tr. 307).  More significantly, Dr. Siddique's notes indicate that Horvath's mental health actually worsened in 2009: he adjusted Horvath's medications in May 2009 after Horvath "[c]omplained of lot of joint pain in addition to depression and anxiety" (Tr. 312), and then in July Dr. Siddique reported that Horvath "does not see much improvement."  The last notes available to the ALJ, from a September 2009 session, indicate that Horvath's depression, anxiety, and irritability had worsened.  (Tr. 314.)  The ALJ's account of the treatment notes is clearly contradicted by the record.

20

Because substantial evidence does not support the ALJ's stated reason for giving little weight to Dr. Siddique's opinion, that it was "not supported by a longitudinal treatment record," this Court recommends remand.

As a second point of error, Plaintiff argues that the ALJ erred in assessing his credibility. (Pl.'s Mot. Summ. J., at 9-13.) But it appears that the ALJ relied in part on treatment records from Dr. Siddique to evaluate Horvath's credibility. (Tr. 64-65.) The ALJ's findings on Horvath's credibility may change after Dr. Siddique's opinion and treatment notes are reevaluated on remand. Accordingly, this Court recommends denying Plaintiff's second claim of error as moot.

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the Administrative Law Judge's reasons for giving less than controlling weight or great deference to a treating physician are not supported by substantial evidence. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 10) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 16) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

On remand, the ALJ should reevaluate Dr. Siddique's opinion, applying the factors set forth in 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c). If necessary, the ALJ should reevaluate Plaintiff's credibility, modify Plaintiff's RFC, and obtain additional vocational expert testimony.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*,

21

474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).

<div style="margin-left:40%">

s/Laurie J. Michelson_____
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  April 18, 2013

</div>

<div style="text-align:center">

CERTIFICATE OF SERVICE

</div>

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on April 18, 2013.

<div style="margin-left:40%">

s/Jane Johnson_____
Deputy Clerk

</div>